## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LARRY ROMSTED and MANIJEH SABA, on behalf of themselves and all similarly situated persons; | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case Number: _____ <br><br> Judge: _____ |
| v. | ) ) | |
| RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY; ROBERT L. BARCHI, President of Rutgers, in his official and individual capacities; RICHARD L. McCORMICK, President Emeritus of Rutgers, in his official and individual Capacities; and the BOARD OF TRUSTEES, and BOARD OF GOVERNORS OF RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY, | ) ) ) ) ) ) ) ) ) ) ) ) | **JURY DEMAND** |
| Defendants. | ) | |

2012 SEP 7 PM 2 02

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

## CLASS ACTION COMPLAINT

PLAINTIFFS, Larry Romsted ("Mr. Romsted") and Manijeh Saba ("Ms. Saba") (together, "Plaintiffs"), through their undersigned counsel, bring this action for damages pursuant to 42 U.S.C. § 1983 *et seq.* and for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, against Defendants as follows:

### I. INTRODUCTION

1.    The Plaintiffs bring this civil rights lawsuit pursuant to the Constitution of the United States, and 42 U.S.C. § 1983 *et seq.* The Plaintiffs seek redress for violations of their right to freedom of speech, guaranteed by the First and Fourteenth Amendments to the United States Constitution. Specifically, Plaintiffs seek declaratory and injunctive relief for themselves and for a class of similarly situated persons.

2.      Mr. Romsted is a U.S. born citizen, a professor at Rutgers, The State University of New Jersey, and a political activist.  He engages in political activities in support of the Palestinian people, including the events at issue in this lawsuit, of which he was a main organizer.

3.      Ms. Saba is an Iran-born US citizen, as well as a human, women's and constitutional rights activist. She regularly engages in political activities in support of the Palestinian people, including the events at issue in this lawsuit, of which she was a main organizer.

4.      Plaintiffs, supporters of US BOAT TO GAZA-NJ, initiated and supported a major event at the Busch Student Center of Rutgers, The State University of New Jersey, New Brunswick that was carried out by the Rutgers University student organization, BAKA: Students United for Middle Eastern Justice, with assistance from Plaintiffs and other members of the plaintiff class. With BAKA, Plaintiffs organized a fund raising event on November 4, 2010.  It was attended by over 250 paying students and members of the public.  Over $3,400 was raised at the event, and the funds were specifically designated for the US BOAT TO GAZA.

5.      Plaintiffs worked with the students to organize the November 4, 2010 event, by making the initial contact with Stand for Justice Inc ("STJ") that was organizing the US Boat to Gaza, by arranging for two of the four speakers at the event, including Lt. Colonel Ann Wright (retired), and film maker Fida Gheshta, as well as helping with publicity, and by making donations.

6.      In news reports, Plaintiffs learned that Anti-Defamation League ("ADL") and Hillel opposed the fundraiser because it criticized Israel's naval blockade of Gaza.  Some concerns were also voiced about the non-profit status of the organizations sending the boat to Gaza. Plaintiffs provided documentation from the Center for Constitutional Rights attesting to the legality of the flotilla, a statement from STJ asserting that the US to Gaza boat is legal under US

2

laws, and on the 501c3 status of the Institute for Media Analysis, Inc. that was handling the finances of the US boat. Copies of the documents are annexed to the complaint as Exhibit A.

7.     After the event, Defendants froze the money that was raised and prevented its release to STJ. In late December 2010, the New Jersey branch of the Anti-Defamation League ("ADL") published on its web site a statement that included the following: "[a]fter ADL's intervention, the school informed organizers that the proceeds could no longer go to the group they had designated and that no funds will be released until the university determines a legal recipient;" and, "[t]hanks to ADL's action, the anti-Israel group was forced to change its plans and find a different donor." A copy of that statement is annexed to the complaint as Exhibit B.

8.     On January 6, 2011, two months after the event, Plaintiffs and other members of the class wrote to Defendant Richard L. McCormick demanding immediate release of the donations made by the public intended for the US BOAT TO GAZA.   His response was negative.  In his letter, McCormick wrote, "the university is seeking, through our Office of General Counsel and on a viewpoint and content-neutral basis, to ensure that any beneficiary of the event proceeds is recognized as a bona fide tax-exempt entity under U.S. law, and that all proceeds will be used fir lawful purposes." Mr. McCormick's response is annexed to the complaint as Exhibit C.

9.     Almost two years later, Defendants continue to withhold the donations raised specifically for the US BOAT TO GAZA. Although Defendants contend they are withholding the funds for content- and viewpoint-neutral reasons, upon information and belief Defendants' decisions to initially freeze the funds and to refuse to release them either to STJ or the substitute organization subsequently chosen by BAKA, the WESPAC Foundation, is based on the content of Plaintiff's speech – specifically, support for Palestine and opposition to the Israeli naval blockade of Gaza. Defendants' treatment of the funds collected at the BAKA fundraiser is an egregious violation of

3

Plaintiffs' freedom of speech because it treats their speech – fundraising – different than other speech on the basis of its content and viewpoint. The First and Fourteenth Amendments prohibit such content- and viewpoint-based discriminatory treatment of protected speech.

10.     Defendants are directly responsible for these injuries to Plaintiffs. They have adopted a policy, practice or custom that discriminates against Plaintiffs' speech based on its content or viewpoint.   In particular, Defendants have adopted a policy, practice or custom that any fundraising must be for a lawful purpose, and they have further determined that criticism of the Israeli naval blockade of Gaza is unlawful, a decision based on pressure from outside groups, in particular the ADL and Hillel.

11.     Plaintiffs, on behalf of themselves and a class of similarly situated persons, seek a declaratory judgment that the defendants' conduct, and policy, practice or custom violated the First and Fourteenth Amendments.   Plaintiffs also seek an injunction preliminarily enjoining Defendants from transferring or otherwise disposing of the proceeds of the fundraiser at issue until the conclusion of this litigation, and an order commanding the policymaker defendants to abandon their prior policy, practice or custom, and to adopt adequate policies and procedures to ensure truly content and viewpoint-neutral treatment of fundraising for political causes and other speech activity on the defendants' campuses. Moreover, all members of the class seek declaratory relief, as well as compensatory and punitive damages.

## II. JURISDICTION AND VENUE

12.     This case arises under the Constitution and laws of the United States and presents a federal question within this Court's jurisdiction under 28 U.S.C.  § 1331.

4

13.     This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq.  Defendants' constitutional violations are actionable pursuant to 42 U.S.C. § 1983.

14.     Venue is proper in the Federal District of New Jersey pursuant to 28 U.S.C. § 1391(b).

### III. PARTIES

#### A.     Plaintiffs

15.     Mr. Romsted is a United States born citizen, a professor at Rutgers University, and a political activist.  He engages in political activities in support of the Palestinian people, including the events at issue in this lawsuit.  Mr. Romsted now resides in Highland Park, New Jersey, in Middlesex County.

16.     Ms. Saba is an Iran-born United States citizen, as well as a human, women's and constitutional rights activist.  She regularly engages in political activities in support of the Palestinian people, including the events at issue in this lawsuit.  Ms. Saba now resides in Somerset, New Jersey, in Somerset County.

#### B.     Defendants

17.     Rutgers, the State University of New Jersey ("Rutgers"), is the largest state university within New Jersey.  It consists of three campuses: (1) New Brunswick / Piscataway; (2) Newark; and (3) Camden.  It is a "person" within the meaning of 42 U.S.C. § 1983. See, for example, Fuchilla v. Layman, 109 N.J. 319 (1988).

18.     Richard L. McCormick was president of Rutgers University from 2002 through June 2012.  During this time period, he was the chief administrator of the university, charged with its day-to-day operations. As President, he had authority over all Rutgers policies, practices, and

customs relating to the treatment of fundraising activities. He is sued in his official and individual capacities.

19.     Robert Barchi became president of Rutgers on September 1, 2012.   He is now the chief administrator of the university, charged with its day-to-day operations. As President, he has authority over all Rutgers policies, practices, and customs relating to the treatment of fundraising activities. He is sued in his official and individual capacities.

20.     The Board of Trustees of Rutgers consists currently of 59 members, and the Board of Governors consists of 11 members: 6 appointed by the Governor of New Jersey and 5 chosen by the Board of Trustees.  Governance at Rutgers rests with these two Boards.  The trustees constitute chiefly an advisory body to the Board of Governors and are the fiduciary overseers of the property and assets of the University that existed before the institution became the State University of New Jersey in 1945. The six members of the Board of Governors appointed by the governor also serve as members of the Board of Trustees. These Boards are each considered a "person" within the meaning of 42 U.S.C. § 1983.

21.     At all times pertinent hereto, all defendants were acting under color of state law and their conduct constituted governmental action.

## IV. PLAINTIFF CLASS ACTION ALLEGATIONS

22.     Plaintiffs bring this action on their own behalf and on behalf of a class of all persons similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. The plaintiff class consists of all persons who attended and donated at the November 4, 2010 US BOAT TO GAZA fund raising event at the Busch Student Center of Rutgers, New Brunswick campus. Approximately 250 people attended this event and donated for the fund raiser.

23.     The plaintiff class satisfies all of the prerequisites stated in Rule 23(a):

a) All have had their free speech rights violated because their claims are identical to those of Plaintiffs, Mr. Romsted and Ms. Saba – specifically, they donated to a political cause, and Defendants discriminated against this speech activity based on its content and/or viewpoint of supporting the Palestinian people and opposing the naval blockade of Gaza.

b) There are questions of law and fact common to the class, including whether the challenged policy, practice or custom violates the First and Fourteenth Amendments to the United States Constitution.

c) The claims of Mr. Romsted and Ms. Saba are typical of the claims of the class.

d) Mr. Romsted and Ms. Saba will fairly and adequately represent the interests of the class. They have no interests antagonistic to the class. They seek declaratory and injunctive relief on behalf of the entire class and such relief will benefit all members of the class.

24.    The class satisfies Rule 23(b)(2) because the defendants have engaged in a course of conduct common to all members of the class, and final declaratory and injunctive relief in favor of the class is therefore appropriate.

## V. FACTS

25.    The allegations of paragraphs 1 to 24 are realleged and incorporated by reference as if fully set forth herein.

26.    At the November 4, 2010 fundraising event, student organizers distributed a legal notice regarding the donations stating that "the funds collected tonight will be held by Rutgers University until the legal issues and status surrounding the beneficiary are resolved.  You [the

7

event attendee and donor] may opt for a refund if there is an alternative recipient chosen by BAKA and this is not your preference." As per the legal notice, the fundraiser proceeds were frozen after the event and were not released to STJ. The November 4, 2010 legal notice is attached to the complaint as Exhibit D, along with the event program.

27.   In his January 25, 2011 letter to Plaintiffs and other members of the plaintiff class, Defendant McCormick indicated that Rutgers would work with BAKA to "determine whether the funds can be released to the 501(c)(3) the group has identified [i.e. STJ]." See Exhibit C. Apparently, it was determined that the funds could not be released to STJ, and BAKA was required to select an alternative organization.

28.   Around May 2011, BAKA selected the WESPAC Foundation, as indicated by a June 13, 2011 statement posted on BAKA's website, which read: "In late May, the WESPAC Foundation ("WESPAC") was approved by the University as an acceptable destination for the funds raised." The BAKA statement is attached to the complaint as Exhibit E. WESPAC is an approved 501(c)(3) under US laws, and only engages in lawful activities. A copy of WESPAC's official 501(c)(3) status letter is also attached as Exhibit E.

29.   The June 13, 2011 BAKA statement concluded: "we are happy to announce that $3,345 has been successfully donated to the Foundation." However, Rutgers never actually gave the November 4, 2010 proceeds or any other money to WESPAC. Instead, after the BAKA statement, Rutgers froze the check to WESPAC. On June 22, 2011, an attorney from Rutgers legal department also called WESPAC to inquire how the money would be used. Nada Khader, WESPAC's director and a speaker at the November 4, 2010 event, told the attorney that the money would be used to support the spirit and intent of the November 4, 2010 event – in other

8

words, that it would support criticism of the Israeli government and Israeli government policy, in particular the naval blockade of Gaza. See second email attached as Exhibit G.

30.    In late July 2011, Ms. Khader communicated with Elizabeth O'Connell-Ganges, Rutger's Executive Director of Student Life, inquiring when Rutgers would donate the money to WESPAC. In an email exchange between Ms. Khader and Ms. O'Connell-Ganges, the latter indicated that the money would eventually be transferred. However, the money never was in fact transferred, and on September 19, 2011, Ms. Khader sent Ms. O'Connell-Ganges another email inquiring whether Rutgers had "made the final decision to give the funds to WESPAC." A copy of this email exchange is attached to the complaint as Exhibit F. Over six months after that email, the funds still have not been given to WESPAC.

31.    On information and belief, Defendants' basis for refusing to release the funds to WESPAC was the viewpoint promoted by WESPAC, one critical of the Israeli government and its policies, in particular the naval blockade of Gaza. Although Defendants claim to be acting in a content- and viewpoint-neutral manner, their decision-making is based on a policy, practice or custom that any criticism of the Israeli naval blockade of Gaza is "unlawful." This policy, practice or custom imposes content and viewpoint restrictions on otherwise available, constitutionally protected speech.

32.    Plaintiffs are suffering, and will continue to suffer, irreparable injury by reason of Defendants' actions complained of herein.

33.    Plaintiffs have suffered damages, and will continue to suffer damages, as a result of Defendants' actions.

34.     Unless restrained, Defendants will continue to engage in unconstitutional viewpoint discrimination against Plaintiffs and similarly situated persons, as well as against Rutgers students that may hold views critical of the Israeli naval blockade of Gaza.

**A.    Defendants' policies and procedures**

35.     Defendants Barchi and the Boards of Trustess and Governors have authority over all Rutgers policies, procedures, and practices relating to the treatment of fundraising on Rutgers campuses. When he served as Rutgers President, Defendant McCormick had authority over all Rutgers policies, procedures, and practices relating to the treatment of fundraising on Rutgers campuses.

36.     Defendants have adopted a policy, practice or custom of discriminating against speech activities, including fund raising, which is critical of the Israeli naval blockade of Gaza.

37.     The policy, practice or custom of Defendants complained of herein directly and proximately caused the unlawful violation of Plaintiffs' free speech rights complained of herein.

38.     Defendants acted intentionally and with deliberate indifference to the rights of Plaintiffs and all members of the class in maintaining the policy, practice or custom complained of herein.

39.     The policy, practice or custom complained of herein are widespread and well-settled, and therefore were known or should have been known to Defendants.

**B.    Defendants' liability**

40.     Each defendant acted willfully, and with conscious disregard and deliberate indifference for the rights of Plaintiffs.

41.     Each defendant participated in the unlawful conduct, acted jointly and in concert with the other defendants who participated or acquiesced in the unlawful conduct, failed to intervene to

stop others from engaging in the unlawful conduct, or knew of and condoned the unlawful conduct.

**C.      Plaintiffs' injuries**

42.     As a direct and proximate result of defendants' unlawful conduct as stated herein, each member of the plaintiff class was subjected to irreparable injury in the form of violation of their First and Fourteenth Amendment free speech rights.

**D.      Necessity of equitable relief**

43.     Defendants have adopted the policy, practice or custom described above.

44.     Unless enjoined by this Court, the Defendants will continue to subject all members of the plaintiff class to the policy, practice or custom described above.

45.     Plaintiffs will suffer irreparable harm as a result of defendants' foregoing policy, practice or custom.

46.     Plaintiffs have no adequate remedy at law.

47.     As a result of the defendants' foregoing policy, practice or custom, members of the plaintiff class also will suffer irreparable harm for which they have no adequate remedy at law.

## VI. CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE FIRST AMENDMENT OF THE U.S. CONSTITUTION
### (42 U.S.C. 1983)

48.     The allegations of paragraphs 1 to 47 are realleged and incorporated by reference as if fully set forth herein.

49.     A violation of the First Amendment's right to free speech constitutes irreparable harm. Elrod v. Burns, 427 U.S. 347 (1976).

11

50.     Defendants' policy that speech critical of the Israeli naval blockade of Gaza is unlawful, and therefore prohibited, violates the First and Fourteenth Amendments to the United States Constitution because it conditions fundraising and similar speech activities on acceptance of content and viewpoint restrictions on otherwise available, constitutionally protected speech.  The policy unconstitutionally burdens the rights of plaintiffs and their members to communicate protected expression.

51.     By conditioning fundraising on refusal to criticize the Israeli government and/or Israeli government policy, Defendants' policy imposes viewpoint-based restrictions on the ability to engage in fundraising, a constitutionally protected form of expressive activity.

52.     The Defendants' policy violates the constitutional rights of Plaintiffs, members of the plaintiff class, and members of the public.

53.     The policy impermissibly imposes content- and viewpoint-based restrictions on speech in a public forum.

54.     The policy is not narrowly tailored to accomplish any compelling government purpose.

55.     The policy is not narrowly tailored to serve a significant government interest.

56.     The policy is unconstitutionally vague and overbroad.

57.     Defendants' unlawful actions caused Plaintiffs harm and they and all members of the plaintiff class are entitled to compensatory and punitive damages.

**COUNT II**
**VIOLATION OF THE FIRST AMENDMENT OF THE U.S. CONSTITUTION**
**(Declaratory Judgment Act, 28 U.S.C. §§ 2201-02)**

58.     Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

59.    A violation of the First Amendment's right to free speech constitutes irreparable harm. Elrod v. Burns, 427 U.S. 347 (1976).

60.    Defendants' unlawful actions caused Plaintiffs harm and they and all members of the plaintiff class are entitled to a declaratory judgment, compensatory and punitive damages, and such other relief that the Court deems appropriate under 28 U.S.C. § 2202.

## JURY DEMAND

Plaintiff seeks a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request that the court:

a.  Preliminarily enjoin Defendants from transferring or otherwise disposing of the proceeds of the fundraiser at issue until the conclusion of this litigation;

b.  Declare that Defendants' conduct, policy and/or custom is unconstitutional and violated the First and Fourteenth Amendment rights of Plaintiffs and each member of the plaintiff class;

c.  Preliminarily and permanently enjoin Defendants from engaging in content- and viewpoint-discrimination against speech criticizing the Israeli naval blockade of Gaza;

d.  Preliminarily and permanently enjoin Defendants from  any activities meant to deprive the plaintiffs of or violate their freedom of speech, freedom of association, and any other civil liberties;

e.  Preliminarily and permanently enjoin Defendants from  any activities meant to retaliate against Plaintiffs for exercise of their constitutional freedoms;

13

f.  Order Defendants to release the fundraising proceeds in question to the WESPAC Foundation;

g.  Award Plaintiffs such damages, costs and fees against Defendants as are allowed by law; and

h.  Grant to Plaintiffs such other, further, and different relief as the court deems equitable and just.

Dated: September 6, 2012

Respectfully submitted,

John P. Leschak, Esq.
(N.J. Bar No. 03113 – 2010; Civil ID No. JL8921)
Leschak & Barbosa, LLC
7 Broad St., Suite 103
Elizabeth, NJ 07201
Phone: (888) 765-1126
Fax: (866) 888-6345

*Counsel for Plaintiffs*

14

# EXHIBIT 'A'

INSTITUTE FOR MEDIA ANALYSIS, INC.
143 WEST 4TH STREET
NEW YORK, NY 10012-1055
212-995-2400

November 2, 2010

To Whom It May Concern,

I have been asked, as counsel to and a director and officer of the Institute for Media Analysis, Inc. (IMA), to expand upon our support, as fiscal sponsor, of Stand for Justice, Inc. (SFJ). IMA is a non-profit, tax-exempt, tax-deductible New York corporation, with 501c3 status since its inception in 1986. It has been in good standing throughout its 24-year existence and has filed all required forms and returns during that period with the State of New York and the IRS. All of those reports are matters of public record.

Our board agreed several months ago to act as fiscal sponsor for the Gaza Boat Trip project of SFJ upon the understanding that this boat was to carry observers and journalists to the coast of Gaza, or as close as they can get, along with some token medical supplies, all in support of the right under international law to provide medicine and other humanitarian aid even into acknowledged conflict zones. That the government of the State of Israel flouts these long-standing principles of international law, enshrined in the Nuremberg Conventions, is why I use the expression "or as close as they can get." Neither I nor, I am sure, the people of Sfj, have any illusions that the Israelis will welcome this ship.

One of the purposes of our organization is to observe the actions of governments and in particular their interaction with the media. The fact that this vessel will have journalists aboard, to report on what happens, puts it squarely within our exempt purposes. Moreover, we believe that the reports of independent journalist eyewitnesses will be of far greater impact than that of most other journalists, whose information will be only second-hand, much of it government propaganda.

Further, it is my understanding that Mr. Nicholas Abramson, whom I know, is indeed the President of SFJ and empowered to speak on its behalf. Further, I have been repeatedly assured that there will be no contraband or illegal materials of any kind on board this vessel. Only, as noted above, observers, journalists, and medical supplies.

1

Should you have any further questions about the sponsorship of SFJ by IMA, please feel free to contact me.

Sincerely,

William H. Schaap,
Director, Secretery-Treasurer

INSTITUTE FOR MEDIA ANALYSIS, INC.
143 WEST 4TH STREET
NEW YORK, NY 10012-1055
212-995-2400

July 14, 2010

To Whom It May Concern:

This is to confirm that the above organization, a New York State Not-for-Profit corporation with tax-exempt status pursuant to section 501(c)(3) of the IRC, has duly agreed to act as fiscal sponsor for Stand for Justice. There is no other relationship between this organization and that entity.

If you have any further questions, you may contact the undersigned at 212-995-2400.

Sincerely,

William H. Schaap,
Director and Secretary-Treasurer

**Internal Revenue Service**                Department of the Treasury

Washington, DC 20224

Person to Contact:   Steve Jankowitz

Institute for Media            Telephone Number: (202) 566-4754
   Analysis, Inc.
145 West Fourth Street
New York, NY  10012            Refer Reply to:
                                  E:EO:R:4

                               Date:  OCT 30  1987

              Employer Identification Number:  13-3331313
                             Key District:  Brooklyn
                    Accounting Period Ending:  December 31
              Foundation Status Classification:  Section 509(a)(2)


Dear Applicant:

     Based on information supplied and assuming your operations will
be as stated in your application for recognition of exemption, we have
determined you are exempt from federal income tax under section 501(c)(3)
of the Internal Revenue Code.

     We have further determined that you are not a private foundation
within the meaning of Code section 509(a), because you are an organization
described in the sections of the Code shown above.

     If your sources of support, or your purposes, character, or method
of operation change, please let your key district know so that office can
consider the effect of the change on your exempt status and foundation
status.  Also, you should inform your key District Director of all changes
in your name or address.

     Unless specifically excepted, beginning January 1, 1984, you must
pay taxes under the Federal Insurance Contributions Act (social security
taxes) for each employee who is paid $100 or more in a calendar year.
You are not required to pay tax under the Federal Unemployment Tax Act
(FUTA).

     Since you are not a private foundation, you are not subject to the
excise taxes under Chapter 42 of the Code.  However, you are not automati-
cally exempt from other federal excise taxes.  If you have questions
about excise, employment, or other federal taxes, contact your key District
Director.

     Donors may deduct contributions to you as provided in Code section
170.  Bequests, legacies, devises, transfers, or gifts to you or for your
use are deductible for federal estate and gift tax purposes if they meet
the applicable provisions of sections 2055, 2106, and 2522.

/ 2

-2-

Institute for Media Analysis, Inc.

You are required to file Form 990, Return of Organization Exempt from Income Tax, only if your gross receipts each year are normally more than $25,000.  If your gross receipts are not normally more than $25,000 we ask that you establish that you are not required to file Form 990 by completing Part I of that Form for your first tax year.  Thereafter, you will not be required to file a return until your gross receipts normally exceed the $25,000 minimum.  For guidance in determining if your gross receipts are "normally" not more than the $25,000 limit, see the instructions for the Form 990.  If a return is required, it must be filed by the 15th day of the fifth month after the end of your annual accounting period.  There is a penalty of $10 a day, up to a maximum of $5,000, when a return is filed late, unless you establish, as required by section 6652(d)(1), that the failure to file timely was due to reasonable cause.

You are not required to file federal income tax returns unless you are subject to the tax on unrelated business income under Code section 511.  If you are subject to this tax, you must file an income tax return on Form 990-T, Exempt Organization Business Income Tax Return.  In this letter we are not determining whether any of your present or proposed activities are unrelated trade or business as defined in section 513.

Please show your employer identification number on all returns you file and in all correspondence with the Internal Revenue Service.

We are informing your key District Director of this ruling.  Because this letter could help resolve any questions about your exempt status and foundation status, you should keep it in your permanent records.

If you have any questions about this ruling, please contact the person whose name and telephone number are shown in the heading of this letter.  For other matters, including questions concerning reporting requirements, please contact your key District Director.

Sincerely yours,

Milton Cerny

Milton Cerny
Chief, Exempt Organizations
  Rulings Branch

# centerforconstitutionalrights
*on the front lines for social justice*

To:     BAKA: Students United for Middle Eastern Justice, Rutgers University

From:  Shane Kadidal, Senior Managing Attorney and Katherine Gallagher, Senior Staff Attorney
        Center for Constitutional Rights

Date:   November 12, 2010

---

You have asked us for a legal opinion on whether delivering humanitarian assistance to
the people of Gaza violates federal or international law. By way of background, the Rutgers
University student group "BAKA: Students United for Middle Eastern Justice" held a fundraiser
on November 4, 2010, that sought to raise money for a non-profit organization that is a
recognized 501(3)(c) organization, which is supporting a US boat to participate in an upcoming
flotilla to Gaza.

This opinion is predicated on the following facts regarding the flotilla and the delivery of
the aid to Gaza. There is a future flotilla planned that will include a boat with Americans bound
for Gaza, as a platform to protest Israel's blockade of Gaza. The boat may simply participate as
part of the larger flotilla, with passengers engaging in advocacy supportive of the human rights
and human needs of Palestinians in Gaza, and critical of Israel's policies that infringe on those
rights and needs. Alternatively, the boat may deliver humanitarian aid to be distributed to the
people of Gaza. The organizers of the U.S. boat do not intend to provide any aid to Hamas. To
the extent that aid is provided, it will be provided only through organizations that are not on either
the State Department's list of "foreign terrorist organizations" or the Treasury Department's list
of "specially designated terrorists" or "specially designated global terrorists." Moreover, the
organizers of the U.S. boat would not provide aid to anyone they have reason to believe is acting
on behalf of, or controlled by, a designated entity.

## Delivering humanitarian assistance under the factual scenario described above does not violate any federal law.

Based on the facts set forth above regarding the future flotilla, the actions of the
organization sending U.S. boat in the flotilla to Gaza would not violate laws banning "material
support" to designated terrorist organizations. There are three such sets of restrictions, but all
prohibit only knowing provision of material support to specifically designated groups or
individuals. Accordingly, as long as the U.S. boat is not knowingly providing aid to a designated
entity, there is no liability under these laws.

The first law is 18 U.S.C. 2339B, which the Supreme Court recently upheld in *Holder v Humanitarian Law Projects.* That law authorizes the Secretary of State to designate "foreign terrorist organizations," and then makes it a crime to provide "material support" to such organizations. "Material support" is defined broadly to include not only money and tangible assets by also "expert advice or assistance," "training," and "service." The statute only prohibits the knowing provision of aid "to" designated organizations, such as Hamas.[1] Thus, as long as the aid is not being provided to Hamas (or to someone you have reason to believe is owned or controlled by or acting on behalf of Hamas or another designated entity), you are not violating 18 U.S.C. 2339B. The law does not bar aid to individuals who are not designated, and does not prohibit the provision of aid to persons in Gaza, so long as they do not fit the above description.

Similar analysis applies to the ban on engaging in transactions with or providing material support to entities designated by the Treasury Department as "specially designated terrorists" or "specially designated global terrorists," under the International Emergency Economic Powers Act. Here, too, the law broadly prohibits aid to and transactions with designated groups, but only with those designated groups or individuals. Hamas has been designated under this law as well. However, as long as aid is provided to entities and individuals who are *not* on the Treasury Department's list (or someone you have reason to believe is owned or controlled by or acting on behalf of a designated entity), you are not violating the International Emergency Economic Powers Act.

The same analysis applies to the third set of restrictions, the Terrorism Sanctions Regulations (under which Hamas is designated a "Specially Designated Terrorist").[2]

---

[1]     The Office of Foreign Assets Control (OFAC) within the Treasury Department publishes one master list of organizations and individuals designated under similar but overlapping federal laws that restrict transactions (both those involving money and those involving free transfer of aid) in goods and services with (directly and indirectly) a long list of entities (including their agents) and individuals (available in several searchable formats here: http://www.treas.gov/offices/enforcement/ofac/sdn/).

[2]     *See* 31 CFR § 595.204 (prohibiting transactions in "funds, goods, or services"); *id.* § 595.408 (a) ("For purposes of this part, a contribution or donation is made to or for the benefit of a specially designated terrorist if made to or in the name of a specially designated terrorist; if made to or in the name of an entity or individual acting for or on behalf of, or owned or controlled by, a specially designated terrorist; or if made in an attempt to violate, to evade or to avoid the bar on the provision of contributions or donations to specially designated terrorists."); *id.* § 595.408(b) ("Individuals and organizations who donate or contribute funds, goods, services or technology without knowledge or reason to know that the donation or contribution is destined to or for the benefit of a specially designated terrorist shall not be subject to penalties for such donation or contribution."); *id.* § 505.202 (prohibited transactions are legally void unless transferor "did not have reasonable cause to know or suspect, in view of all the facts and circumstances known or available to such person, that such transfer required a license or authorization by or pursuant to this part").

## Participating in a flotilla to Gaza as a form of protest and/or delivering humanitarian assistance to the people of Gaza violates no federal or international law.

### The Legality of the Blockade

As an initial matter, the Israeli blockade of the Gaza Strip is illegal under international law.[3]

The San Remo Manual on International Law Applicable to Armed Conflicts at Sea (1994),[4] which recognizes that blockades in the context of armed conflicts,[5] prohibits a blockade if: (a) it has the sole purpose of starving the civilian population or denying it other objects essential for its survival; or (b) the damage to the civilian population is, or may be expected to be, excessive in relation to the concrete and direct military advantage anticipated from the blockade.[6] The San Remo Manual also provides: "If the civilian population of the blockaded territory is inadequately provided with food and other objects essential for its survival, the blockading party must provide for free passage of such foodstuffs and other essential supplies," subject to certain technical arrangements and conditions of distribution.[7]

The international community has repeatedly and emphatically called for an end to the blockade of the Gaza Strip.[8] Reports on the situation in Gaza under the Israeli blockade by the

---

[3]    For a discussion on the scope and effect of the "blockade," *see* Human Rights in Palestine and Other Occupied Arab Territories, Report of the United Nations Fact Finding Mission on the Gaza Conflict, A/HRC/12/48, ¶ 27, Sept. 15, 2009 ("Goldstone Commission Report").

[4]    *San Remo Manual on International Law Applicable to Armed Conflicts at Sea*, June 12, 1994 ("San Remo Manual"), available at: http://www.icrc.org/IHL.nsf/52d68d14de6160e0c12563da005fdb1b/7694fe2016f347e1c125641f002d49ce!OpenDocument.

[5]    The analysis of the blockade takes into account the laws of occupation; Israel is the occupying power because of the complete control of access to and egress from the territory. *See* Hague Regulations, Art. 42. *See, e.g.,* Goldstone Commission Report, ¶ 187: "In addition to controlling the borders, coastline and airspace, after the implementation of the disengagement plan, Israel continued to control Gaza's telecommunications, water, electricity and sewage networks, as well as the population registry, and the flow of people and goods into and out of the territory while the inhabitants of Gaza continued to rely on the Israeli currency; *Id.,* ¶ 28: "The Mission holds the view that Israel continues to be duty-bound under the Fourth Geneva Convention and to the full extent of the means available to it to ensure the supply of foodstuff, medical and hospital items and others to meet the humanitarian needs of the population of the Gaza Strip without qualification." Article 55 of the Fourth Geneva Convention requires the occupier to provide food and health care to the occupied population. Accordingly, the blockade can be found to be illegal on the basis that an occupier cannot blockade the territory it is occupying; pursuant to the San Remo Manual, blockades are only legal in the armed conflicts – not occupation, as is the case for Gaza.

[6]    San Remo Manual, *supra* n.4, par. 102.

[7]    *Id.,* par. 103.

[8]    *See, e.g.,* "UN human rights chief calls for end to the Israeli blockade of Gaza," Nov. 18, 2008, available at www.un.org/apps/news/story.asp?NewsID=28983&Cr=Palestin&Cr1 (UN High Commissioner for Human Rights Navi Pillay stated: "By function of this blockade, 1.5 million Palestinian men, women and children have been forcibly deprived of their most basic human rights for months. This is in direct contravention of international human rights and humanitarian law. It must end now."); "UN chief Blames Israeli Blockade for Suffering in Gaza," Mar. 21,

World Health Organization and United Nations Relief Works Agency (UNRWA) demonstrate the impact of the blockade on the Palestinian population of Gaza: inadequate food supplies leading to malnutrition and starvation, a crumbling and over-burdened health care system, environmental harms caused by pollution due to heavy damage to the water and sanitation facilities, lack of schools and supplies to maintain a functioning education system and a lack of supplies needed to rebuild destroyed homes.[9]  The impact of the blockade has been felt acutely on Gaza's most vulnerable: children.[10]  The Commissioner-General of UNRWA recently summarized the situation in Gaza in stark terms: "The closure and associated policies have resulted in a crisis that transcends the humanitarian sphere. Every Gazan is affected by poverty, unemployment and crippled public services, causing human misery on a massive scale."[11]

It can therefore be concluded that the impact of the Israeli blockade on the civilian population of Gaza amounts to "collective punishment," as defined in Article 33 of the Fourth Geneva Convention of 1949, and cannot be reconciled with the principles of international law, including international humanitarian law.[12]

---

2010, available at: www.voa.com/english/news/UN-Chief-In-Gaza-Strip-To-Express-Solidarity-With-Palestinians-88759057.html (Secretary General Ban Ki-moon stated: "I have repeatedly made it quite clear to Israel's leaders that the Israeli policy of closure is not sustainable and that it's wrong. It causes unacceptable suffering of human beings."); Report of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, Richard Falk, A/HRC/10/20, ¶ 41(c), Feb. 11, 2009 ("sustainable peace in Gaza requires the permanent lifting of the blockade in the short term").

[9]      *See, e.g.,* www.unrwa.org; http://www.who.int/hac/crises/international/wbgs/en/ (WHO reports and statements on the occupied Palestinian territory). *See also* Goldstone Commission Report, *supra* n.3, ¶¶ 1217-1335; *Gaza closure: not another year!* International Committee of the Red Cross, June 14, 2010, News Release 10/103 available at: http://www.icrc.org/web/eng/siteeng0.nsf/html/palestine-update-140610 ("ICRC June Statement") (reporting on "all-time low" of medical supplies, including essential medicines, and the effects of electricity cuts on heath care, including power outages during surgery); Report of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, Richard Falk, A/HRC/13/53/Rev.1, June 7, 2010, ¶¶ 30-34. *See, e.g,* Goldstone Commission Report, ¶ 65 ("Insufficient supply of fuel for electricity generation had a negative impact on industrial activity, on the operation of hospitals, on water supply to households and on sewage treatment. Import restrictions and the ban on all exports from Gaza affected the industrial sector and agricultural production. Unemployment levels and the percentage of the population living in poverty and deep poverty were rising.").

[10]      Goldstone Commission Report, *supra* n.3, ¶ 70: "Children's learning difficulties of psychological origin are compounded by the impact of the blockade and the military operations on the education infrastructure. 280 schools and kindergartens were destroyed in a situation in which already restrictions on the importation of construction materials meant that many school buildings were in serious need of repair." *See also* "40,000 students turned away from UNRWA schools due to Gaza closure," Press Release, Sept. 15, 2010, available at: http://www.unrwa.org/etemplate.php?id=797.

[11]      Commissioner-General's Statement to the Advisory Commission, 21-22 June 2010, available at: http://www.unrwa.org/etemplate.php?id=712.

[12]      *See, e.g.,* Report of the international fact-finding mission to investigate violations of international law, including international humanitarian and human rights law, resulting from the Israeli attacks on the flotilla of ships carrying humanitarian assistance, A/HRC/15/21, Sept. 27, 2010, paras. 53-54, 59-61, and 261, available at: http://www2.ohchr.org/english/bodies/hrcouncil/docs/15session/A.HRC.15.21_en.pdf ("UN Flotilla Report"), and sources cited therein.

*Participation in the Flotilla*

The stated purpose of the planned flotilla is two-fold: to protest the blockade of Gaza and to deliver humanitarian assistance to Gaza. Neither purpose violates federal or international law.

The Human Rights Council conducted a fact-finding mission to investigate any possible violations of international law related to the Israeli attack on the Gaza-bound flotilla on May 31, 2010. The report of that mission was released on September 27, 2010.[13] The stated aims of the May 2010 flotilla were threefold: (a) to draw international public attention to the situation in the Gaza Strip and the effect the blockade; (b) to break the blockade; and (c) to deliver humanitarian assistance and supplies to Gaza.[14] Particularly relevant to the instant matter, in discussing the May 2010 flotilla, the fact find mission observed "[p]articipants raised money within their communities for the trip and also solicited cash donations which would be given directly to the population of Gaza."[15]

The report discusses the "aims of the Free Gaza Movement and the Gaza flotilla of May 2010,"[16] examined the preparation of the flotilla,[17] and contains numerous findings relevant to this opinion:

- The flotilla passengers are considered civilians and are considered "protected persons" under the Fourth Geneva Convention;[18]
- Among the rights for all flotilla participants violated by the interception of the boats and detention of passengers is the freedom of expression;[19] and
- Punishing Israeli citizens for participating in the flotilla could give rise to violations of international law obligations, including freedom of expression and political participation rights.[20]

The fact finding mission conclusions were made with the understanding that while the flotilla constituted a "serious attempt to bring essential humanitarian supplies into Gaza," "the primary objective" of the flotilla was political.[21] Such an objective does not render participation

---

[13]  UN Flotilla Report, *supra* n.12.
[14]  *Id.* at ¶ 79.
[15]  *Id.* at ¶ 87.
[16]  *Id.* at ¶¶ 76-80
[17]  *Id.* at ¶¶ 84-90.
[18]  *Id.* at ¶ 66.
[19]  *Id.* at ¶ 265. *See also id.* at ¶ 276 ("humanitarian organizations who wish to intervene in situations of long-standing humanitarian crises where is the international community is unwilling for whatever reason to take positive action [are] [t]oo often..accused of being meddlesome and at worst as terrorists or enemy agents.")
[20]  *Id.* at ¶ 257.
[21]  *Id.* at ¶ 80

in the flotilla illegal. Notably, when the Human Rights Committee conducted its review of Israel's human rights record, it reserved its criticism for Israel's attack on the May 2010 flotilla – not for the organizers or the participants of the flotilla.[22]

Furthermore, the fact finding mission made relevant findings related to the legality of intercepting the blockade:

- The decision to stop the flotilla was not taken because the vessels in themselves posed any immediate security threat, no right of belligerent interdiction or wider claim of self-defense against the flotilla has been asserted by Israel, and the flotilla presented no imminent threat;[23]
- The interception of the flotilla was motivated by concerns about the possible "propaganda victory" of the organizers of the flotilla;[24] and
- the interception of the flotilla was illegal.[25]

The conclusions of the Human Rights Council's fact finding mission, drawing on international human rights law and international humanitarian law, reflect that participating in the flotilla as a form of protest and/or to deliver humanitarian assistance to the people of Gaza who are living under an illegal blockade falls within *inter alia* the right of the participants to freedom of expression, freedom of association and political participation – rights that are recognized under federal law and by the United States.[26]

---

[22] Consideration of reports submitted by States parties under article 40 of the Covenant Concluding observations of the Human Rights Committee, Israel, CCPR/C/ISR/CO/3, Sept. 3, 2010, para. 8: "The Committee also notes with concern the use of force when boarding vessels carrying humanitarian aid for the Gaza Strip, which resulted in the death of nine individuals and the wounding of several others."

[23]    UN Flotilla Report, *supra* n.12, at ¶ 56.

[24]    *Id.* at ¶ 57.

[25]    *See, e.g., id.* at ¶ 174.

[26] *See, e.g.,* Report of the United States of America submitted to the U.N. High Commissioner for Human Rights in Conjunction with the Universal Periodic Review, A/HRC/WG.6/9/USA/1, Aug. 23, 2010, ¶¶ 17-18 ("dissent is a valuable and valued part of our politics: democracy provides a marketplace for ideas, and in order to function as such, new ideas must be permitted, even if they are unpopular or potentially offensive"); ¶¶ 22-23 ( "In the United States our vibrant civil society exists because people freely come together to meet and share interests and to advocate for political and other causes." ); ¶¶ 24-27,  available at: http://lib.ohchr.org/HRBodies/UPR/Documents/session9/US/A_HRC_WG.6_9_USA_1_United%20States-eng.pdf

6 of 6

# EXHIBIT 'B'

**New Jersey Page of the Anti Defamation League Web site**

http://regions.adl.org/new-jersey/news/adl-challenges-anti-israel.html

**Posted Statement**

**ADL Challenges Anti-Israel Fundraiser at Rutgers**

**Date:** December 20, 2010

ADL successfully intervened at Rutgers University when an anti-Israel fund-raiser was planned to support a flotilla that would challenge the Israeli blockade to Hamas-controlled Gaza. Thanks to ADL's action, the anti-Israel group was forced to change its plans and find a different donor.

In late September, ADL learned that a Rutgers University student group was holding a fundraiser to support "UsToGaza," an organization seeking to launch an American ship that would be part of an international flotilla attempting to violate Israel's blockade of Gaza.

Working closely with Rutgers Hillel, ADL's New Jersey Office immediately contacted the university to voice deep concern. In a letter to Rutgers University President Richard McCormick, ADL warned the school that unless they intervened, money would be funneled from a taxpayer-supported, public university to an organization threatening to commit a war-like, belligerent act against one of America's closest allies, Israel.

The fundraiser was not a matter of constitutionally protected free speech: violating a lawful maritime blockade is tantamount to an act of war and ADL pointed out that the blockade runners would likely attempt to deliver goods, services or technical assistance to Hamas, a designated foreign terrorist organization.

After ADL's intervention, the school informed organizers that the proceeds could no longer go to the group they had designated and that no funds will be released until the university determines a legal recipient.

# EXHIBIT 'C'



# RUTGERS

THE STATE UNIVERSITY
OF NEW JERSEY

Richard L. McCormick, President

January 25, 2011

Ms. Carol Gay
747 Thiele Road
Brick, NJ 08724

Ms. Marion Munk
618 South Randolphville Road
Piscataway, NJ 08854

Professor Larry Romsted
228 Montgomery Street
Highland Park, NJ 08903

Ms. Manijeh Saba
146 Emerson Road
Somerset, NJ 08873

Dear Ms. Gay, Ms. Munk, Professor Romsted, and Ms. Saba:

Thank you for your recent letter about the November 4 fundraiser organized by BAKA: Students United for Middle Eastern Justice. I appreciate your concern and applaud the support and encouragement you have given to the students involved in BAKA.

The Rutgers Department of Student Life has been working closely with the officers of BAKA throughout the past several months, and I have heard very positive things about the leadership of the students in organizing the fundraiser and in communicating with the Student Life advising staff. The university has always been supportive of the students in their planning efforts and there were never any questions about holding the program. However, during the course of the planning for the event, questions were raised and discussed internally that led Student Life to review its own policies on student fundraising initiatives.

By the date of the event, it was not possible for Rutgers to determine the recipient of the funds, and the officers of BAKA very responsibly informed those attending the event of this fact with a notice at the registration table. The notice read in part: "This letter is to notify the attendees of the US TO GAZA Flotilla Fundraiser that the funds collected tonight will be held by Rutgers University until the legal issues and status surrounding the beneficiary are resolved. You may opt for a refund if there is an alternative recipient chosen by BAKA and this is not your preference."

Old Queens Building • 83 Somerset Street • New Brunswick, NJ 08901-1281
Web: www.rutgers.edu • Email: president@rutgers.edu • Phone: 732-932-7454 • Fax: 732-932-8060

Ms. Carol Gay
Ms. Marion Munk
Professor Larry Romsted
Ms. Manijeh Saba
January 25, 2011
Page 2

As you noted, the event was a success and drew approximately 250 people; more than $3,000 was raised. As Vice President for Student Affairs Greg Blimling has stated, the university is seeking, through our Office of General Counsel and on a viewpoint- and content-neutral basis, to ensure that any beneficiary of the event proceeds is recognized as a bona fide tax-exempt entity under U.S. law, and that all proceeds will be used for lawful purposes.

We have a responsibility to initiate processes of inquiry that are thorough in order to allow our students to organize and host events that are safe, educational, and meet all business, financial, and legal guidelines. While I regret that the inquiry is taking longer to complete than we would have liked, we are pursuing a process that is in the best interest of our students and their educational experience.

Please know that we will work directly with the BAKA leadership through this process to determine whether the funds can be released to the 501(c)(3) the group has identified. Again, I appreciate your interest and assure you that Rutgers takes this matter very seriously and is working toward a resolution.

Sincerely yours,

Richard L. McCormick

Richard L. McCormick

c:   Gregory Blimling, Vice President for Student Affairs

# EXHIBIT 'D'

# LEGAL NOTICE REGARDING YOUR DONATIONS

THIS LETTER IS TO NOTIFY THE ATTENDEES OF THE USTOGAZA

FLOTILLA FUNDRAISER THAT THE FUNDS COLLECTED TONIGHT

WILL BE HELD BY RUTGERS UNIVERSITY UNTIL THE LEGAL ISSUES

AND STATUS SURROUNDING THE BENEFICIARY ARE RESOLVED.


YOU MAY OPT FOR A REFUND IF THERE IS AN ALTERNATIVE

RECIPIEINT CHOSEN BY BAKA AND THIS IS NOT YOUR PREFERENCE.


PLEASE FILL OUT THE REFUND INFORMATION FORM AT THE

REGISTRATION DESK.


THANK YOU KINDLY FOR YOUR PATIENCE AND UNDERSTANDING.

WE WILL BE WORKING CLOSELY WITH RUTGERS UNIVERSITY TO

GET THIS MATTER RESOLVED.


BAKA *STUDENTS UNITED FOR MIDDLE EASTERN JUSTICE*

BAKA: Students United for Middle
Eastern Justice presents

# US TO GAZA
# FUNDRAISER



November 4, 2010
Busch Campus Center
Rutgers University
Piscataway, NJ

---

## Acknowledgements

### BAKA Executive Board

Sami Jitan – Secretary/Events Coordinator
Hoda Mitwally – Public Relations
Michael Dunican – Treasurer
Sabrina Mirza – Fundraising Chair
Bilal Ahmed – Webmaster/Historian

### Co-Sponsoring Organizations

Anti-Racist Action – New Brunswick; Palestine Children's
Relief Fund of Rutgers; Rutgers Arab Culture Club; Rutgers
Project Nur; NJIT Muslim Students' Association; Rutgers New
Brunswick Muslim Students' Association; Montclair State
University Muslim Students' Association; Middlesex County
College Muslim Students' Association; Central Jersey Coalition
Against Endless War; New Jersey Labor Against War;
Progressive Democrats of New Jersey; Peoples' Organization
for Progress.

### Catering

Douglass Halal Pizza & Grill (New Brunswick, NJ)

### Food Donations

Nablus Pastry & Sweets (Paterson, NJ)
Nayef Pastry & Sweets (Paterson NJ)

### Financial Contributors

Mr. Ibrahim Naboulsi
Mr. Muhammad Musad
Dr. Hasan Elmansoury
Dr. Raed Jitan
Ms. Shehnaz Abdeljaber
Central Jersey Coalition Against Endless War

Thank you to all!
Join our mailing list:
baka.rutgers@gmail.com

## Event Schedule

| 7:30 P.M. | Buffet dinner with banquet seating |
|---|---|
| 8:00 P.M. | General Introduction |
| 8:10 P.M. | Preview screening of Fida Qishta's *Where Should the Birds Fly?* & short talk |
| 8:30 P.M. | Introduction for panel speakers |
| 8:35 P.M. | Colonel Ann Wright |
| 9:00 P.M. | Adam Shapiro |
| 9:25 P.M. | Nada Khader (discussant) |
| 9:40 P.M. | Question and answer session |
| 10:30 P.M. | Acknowledgements & conclusion |

## Tonight's Speakers

**FIDA QISHTA**
Palestinian journalist, filmmaker and teacher from the Gaza Strip. She will present a preview of her upcoming film, *Where Should the Birds Fly?*

**COLONEL ANN WRIGHT**
Former Army colonel and diplomat, anti-war activist and survivor of the Israeli attack on the Mavi Marmara.

**ADAM SHAPIRO**
Documentary filmmaker, human rights activist, co-founder of the International Solidarity Movement and board member of the Free Gaza Movement.

**NADA KHADER**
Palestinian-American activist and Executive Director of WESPAC Foundation, a peace and justice action and educational network in Westchester County, NY.

# DONATING

Please consider making a donation tonight (see a BAKA board member). You can also donate by mail.

**All donations under $150 and non-tax deductible contributions of $150 and over:**

Make check to: Stand For Justice

Mail to: Stand For Justice

PO Box 373

Shady, NY 12409

**All tax-deductible donations of $150 and over:**

Make check to: Institute For Media Analysis

Mail to: Institute For Media Analysis

143 West 4th Street

New York, NY 10012



# EXHIBIT 'E'

12

BAKA Rutgers - US to Gaza Fundraiser Update



# BAKA Rutgers

**Students United for Middle Eastern Justice**

Contact Us / BAKA in the Media / Meeting Times / RSS / Archive

Search

JUN
**13**

## US to Gaza Fundraiser Update

In November of last year, BAKA held an event to raise funds for the **US to Gaza** campaign. Despite the University's initial approval of the fundraiser and US to Gaza's fiscal sponsor as an acceptable recipient of funds raised, the University was successfully **pressured** to review their decision only days before the event. AP coverage may be found **here**.

The event was allowed to continue but due to the unresolved destination of funds raised, BAKA prepared two sign-in sheets. All event attendees were asked to sign one of the two. Here is the full text of both sheets:

1.) PLEASE SIGN THE FORM BELOW IF YOU WANT YOUR MONEY DONATED TO THE USTOGAZA HUMANITARIAN RELIEF EFFORT OR TO AN ALTERNATIVE NON PROFIT WITH THE SAME INTENTION OF PROVIDING FOR GAZA RELIEF.

2.) REFUND REQUEST IN THE EVENT YOU DO NOT WANT AN ALTERNATIVE BENEFICIARY TO RECEIVE YOUR DONATION.

In late May, the **WESPAC Foundation** was approved by the University as an acceptable destination for the funds raised, and we are happy to announce that $3345 has been successfully donated to the Foundation. Due to WESPAC's

BAKA Rutgers - US to Gaza Fundraiser Update

continued support of the US to Gaza campaign and Executive
Director Nada Khader's direct participation as a speaker on the
panel of our fundraiser that evening, BAKA feels WESPAC is an
appropriate destination for the funds raised.

Posted at 5:57 PM    Permalink ∞

---

**Tumblr** powered    **Bill Israel** designed    **RSS** syndicated

Internal Revenue Service
District Director

Department of the Treasury

P. O. Box 2508
Cincinnati, OH  45201

Date: November 2, 1999

WESPAC Foundation
255 Dr. Martin Luther King, Jr., Blvd.
White Plains, NY  10601-4103

Person to Contact:
   Robert Molloy 31-04023
   Customer Service Representative
Telephone Number:
   877-829-5500
Fax Number:
   513-263-3756
Federal Identification Number:
   13-3109400

Dear Sir:

This letter is in response to your request for a copy of your organization's determination letter.  This letter will take the place of the copy you requested.

Our records indicate that a determination letter issued in May 1982 granted your organization exemption from federal income tax under section 501(c)(3) of the Internal Revenue Code.  That letter is still in effect.

Based on information subsequently submitted, we classified your organization as one that is not a private foundation within the meaning of section 509(a) of the Code because it is an organization described in sections 509(a)(1) and 170(b)(1)(A)(vi).

This classification was based on the assumption that your organization's operations would continue as stated in the application.  If your organization's sources of support, or its character, method of operations, or purposes have changed, please let us know so we can consider the effect of the change on the exempt status and foundation status of your organization.

Your organization is required to file Form 990, Return of Organization Exempt from Income Tax, only if its gross receipts each year are normally more than $25,000.  If a return is required, it must be filed by the 15th day of the fifth month after the end of the organization's annual accounting period.  The law imposes a penalty of $20 a day, up to a maximum of $10,000, when a return is filed late, unless there is reasonable cause for the delay.

All exempt organizations (unless specifically excluded) are liable for taxes under the Federal Insurance Contributions Act (social security taxes) on remuneration of $100 or more paid to each employee during a calendar year.  Your organization is not liable for the tax imposed under the Federal Unemployment Tax Act (FUTA).

Organizations that are not private foundations are not subject to the excise taxes under Chapter 42 of the Code.  However, these organizations are not automatically exempt from other federal excise taxes.

Donors may deduct contributions to your organization as provided in section 170 of the Code.  Bequests, legacies, devises, transfers, or gifts to your organization or for its use are deductible for federal estate and gift tax purposes if they meet the applicable provisions of sections 2055, 2106, and 2522 of the Code.

# EXHIBIT 'F'

# Gmail
by Google

John Leschak <john@lblawyers.com>

---

## Fwd: Fw: WESPAC Foundation: use of BAKA funds

1 message

---

**Manijeh Saba** <manijeh.saba@gmail.com>                    Tue, Aug 28, 2012 at 2:08 PM
To: Larry Romsted <romsted@rutchem.rutgers.edu>, John Leschak <john@lblawyers.com>

This the email  #2 from Nada.
Mnaijeh

———— Forwarded message ————
From: **nada khader** <nirainjana@yahoo.com>
Date: Wed, Aug 22, 2012 at 11:30 AM
Subject: Fw: WESPAC Foundation: use of BAKA funds
To: Manijeh Saba <manijeh.saba@gmail.com>


FYI:



----- Forwarded Message -----
**From:** Elizabeth O'Connell-Ganges <eocg@echo.rutgers.edu>
**To:** nada khader <nirainjana@yahoo.com>
**Cc:** Kerri Willson <kwillson@echo.rutgers.edu>; Michael Dunican
<mibredunican@gmail.com>; Hoda Mitwally <h.mitwally@gmail.com>
**Sent:** Thursday, September 22, 2011 2:42 PM
**Subject:** RE: WESPAC Foundation: use of BAKA funds


Nada,

I am very sorry for a process that has gone on so long.  Kerri is meeting with Michael and the new BAKA treasurer
tomorrow.  I will contact you by phone to discuss everything.


Elizabeth

Elizabeth O'Connell-Ganges
Executive Director, Student Life
Rutgers University
126 College Avenue - Room 302
New Brunswick, NJ 08901
(732) 932-7962
(732) 932-7996 (fax)
http://getinvolved.rutgers.edu

8/12                Leschak & Barbosa Mail : Fw: WESPAC Foundation: use of BAKA funds

**From:** nada khader [mailto:nirainjana@yahoo.com]
**Sent:** Monday, September 19, 2011 12:14 PM
**To:** Elizabeth O'Connell-Ganges
**Cc:** Kerri Willson; Michael Dunican; Hoda Mitwally
**Subject:** Re: WESPAC Foundation: use of BAKA funds

Hello Elizabeth and Kerri,

Has Rutgers made the final decision not to give the funds to WESPAC? We would like some closure to this matter.

Thank you,

*Nada Khader*
*Executive Director*
*WESPAC Foundation*
*www.wespac.org*
*914 449-6514*

---

**From:** Elizabeth O'Connell-Ganges <eocg@echo.rutgers.edu>
**To:** nada khader <nirainjana@yahoo.com>
**Cc:** Kerri Willson <kwillson@echo.rutgers.edu>
**Sent:** Monday, August 1, 2011 5:19 PM
**Subject:** RE: WESPAC Foundation: use of BAKA funds

Nada,

Thanks for the information. I have shared this, and I will work on getting you an update as soon as I can.

Elizabeth

Elizabeth O'Connell-Ganges
Executive Director, Student Life
Rutgers University
126 College Avenue - Room 302
New Brunswick, NJ 08901
(732) 932-7962
(732) 932-7996 (fax)
http://getinvolved.rutgers.edu

---

**From:** Elizabeth O'Connell-Ganges <eocg@echo.rutgers.edu>
**To:** nada khader <nirainjana@yahoo.com>
**Cc:** Kerri Willson <kwillson@echo.rutgers.edu>

**Sent:** Wednesday, July 27, 2011 10:16 PM
**Subject:** RE: WESPAC Foundation

Unfortunately, I am in back-to-back meetings tomorrow, so I am not optimistic that I will have more information before your meeting. I will get you information as soon as I have it. Elizabeth

Elizabeth O'Connell-Ganges
Executive Director, Student Life
Rutgers University
126 College Avenue - Room 302
New Brunswick, NJ 08901
(732) 932-7962
(732) 932-7996 (fax)
http://getinvolved.rutgers.edu

---

**From:** nada khader [mailto:nirainjana@yahoo.com]
**Sent:** Wednesday, July 27, 2011 11:53 AM
**To:** Elizabeth O'Connell-Ganges
**Cc:** Kerri Willson
**Subject:** Re: WESPAC Foundation

Thank you, Elizabeth. I have a committee meeting tomorrow evening (Thursday) at 7pm. If you have any news for me by then, I would be really grateful!

**Nada Khader**
**Executive Director**
**WESPAC Foundation**
**www.wespac.org**
**914 449-6514**

---

**From:** Elizabeth O'Connell-Ganges <eocg@echo.rutgers.edu>
**To:** nada khader <nirainjana@yahoo.com>
**Cc:** Kerri Willson <kwillson@echo.rutgers.edu>
**Sent:** Tuesday, July 26, 2011 5:43 PM
**Subject:** WESPAC Foundation

I received a phone message from you today, and I am sorry I have not had the chance to return your call. Given schedules, we have not all had the chance to talk about the information you have provided. I will try to get in touch with you by the end of the week or early next week. I am sorry for the delay.

Elizabeth

*********************************

Elizabeth O'Connell-Ganges
Executive Director, Student Life
Rutgers University

126 College Avenue - Room 302

New Brunswick, NJ 08901

(732) 932-7962

(732) 932-7996 (fax)

http://getinvolved.rutgers.edu

--
NOTICE: Due to Bush's Presidential Executive Orders and President Obama's refusal to rescind it, the National Security Agency may have read this email without warning, warrant, or notice, and certainly without probable cause. They may do this without any judicial or legislative oversight.  Urge the Congress to legislate against this Executive Order and demand investigation of all responsible.

# **<u>EXHIBIT 'G'</u>**


Gmail
by Google

John Leschak <john@lblawyers.com>

# Fwd: Fw: Fwd: WESPAC Donation and withdrawal date

1 message

**Manijeh Saba** <manijeh.saba@gmail.com>
To: John Leschak <john@lblawyers.com>, Larry Romsted <romsted@rutchem.rutgers.edu>

Thu, Sep 6, 2012 at 11:12 AM

Hello John,

You Many want to use this.

I would send you my comments soon.

Manijeh

————— Forwarded message —————
From: **nada khader** <nirainjana@yahoo.com>
Date: Wed, Aug 22, 2012 at 11:34 AM
Subject: Fw: Fwd: WESPAC Donation
To: Manijeh Saba <manijeh.saba@gmail.com>

So it was June 22 when Rutgers called me to say they have put a stop on the check:

----- Forwarded Message -----
**From:** Michael Dunican <mibredunican@gmail.com>
**To:** nirainjana@yahoo.com; BAKA: Students United for Middle Eastern Justice
<baka.rutgers@gmail.com>; Hoda Mitwally <h.mitwally@gmail.com>
**Sent:** Wednesday, June 22, 2011 7:00 PM
**Subject:** Fwd: WESPAC Donation

Nada,

As frustrating as this, you have no need to apologize. This is what I received from Kerri. She only sent it
about two hours ago, and this is all I know. I wish I knew more. I doubt they will tell me anything that they
won't tell you, but in any case, I'll keep in contact with you about this.

In solidarity,
Michael

---------- Forwarded message ----------
From: **Kerri Willson** <kwillson@echo.rutgers.edu>
Date: Wed, Jun 22, 2011 at 5:04 PM
Subject: WESPAC Donation

To: Michael Dunican <mibredunican@gmail.com>
Cc: Elizabeth O'Connell-Ganges <eocg@echo.rutgers.edu>


Michael,

I just wanted to inform you we've asked Nada from WESPAC to hold off on depositing the check. A
question has been raised once again regarding the donation and counsel will do their due diligence to ensure
everything is OK.  Nada is aware of this.  I will keep you informed as things progress.

Kerri

**********************************
Kerri Willson
Director, Student Involvement
Student Life
613 George Street
New Brunswick, NJ  08901
732-932-6978 (o)
732-932-1080 (f)
kwillson@rutgers.edu<blocked::blocked::mailto:kwillson@rutgers.edu>


--
NOTICE: Due to Bush's Presidential Executive Orders and President Obama's refusal to rescind it, the National
Security Agency may have read this email without warning, warrant, or notice, and certainly without probable
cause. They may do this without any judicial or legislative oversight.  Urge the Congress to legislate against this
Executive Order and demand investigation of all responsible.